M. S. C. HOLDING CORPORATION, AND AFFILIATED CORPORATIONS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

960 PARK AVENUE CO., INC.; 115 INCORPORATED; 907 FIFTH AVENUE CO., INC.; C. C. CORPORATION; AND 550 PARK AVENUE CORPORATION, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 4620, 6978.    Promulgated June 8, 1927.

AFFILIATIONS.—Of the eight corporations involved in these two actions seven of such corporations are held to be affiliated and one held not affiliated with any of the others.

*Richard S. Holmes, Esq.,* for the petitioners.
*J. Harry Byrne, Esq.,* for the respondent.

This proceeding is taken from the Commissioner's determination of deficiencies in income and profits taxes of the corporations and in the amounts following:

| Corporation | Year | Amount of deficiency |
|---|---|---|
| M. S. C. Holding Corporation | 1919 | $193.88 |
| 960 Park Avenue Co., Inc. | 1920 | 6,451.91 |
| 115 Incorporated | 1920 | 2,072.28 |
| 907 Fifth Avenue Co., Inc. | 1918 | 14,859.01 |
| Do | 1919 | 14,258.60 |
| Do | 1920 | 18,692.29 |
| C. C. Corporation | 1919 | 6,768.46 |
| Do | 1920 | 3,832.41 |
| 550 Park Avenue Corporation | 1918 | 11,770.05 |
| Do | 1920 | 9,030.29 |
| Total | | 87,929.18 |

The petition, Docket No. 4620, of the M. S. C. Corporation and the C. C. Corporation as to the year 1919, and the joint petition, Docket No. 6978, of the other petitioners, have been consolidated for the purpose of hearing and redetermination.

The petitioners allege that the above-named corporations were during the years 1918, 1919, and 1920, affiliated with each other, and also with two other corporations known as the K. T. B. Realty Corporation and the 630 Park Avenue Co., Inc., and further allege that the Commissioner erred in disallowing such affiliation. The Commissioner has not asserted a deficiency against either of the two latter corporations, but counsel for the parties hereto have agreed that the eight corporations should be considered in this proceeding with respect to the question of affiliation.

### FINDINGS OF FACT.

The eight real estate corporations, all of which since their organization have operated in New York City, were incorporated under the laws of the State of New York on the following dates:

960 Park Avenue Co., Inc. _____ April, 1913.
630 Park Avenue Co., Inc. _____ March, 1914.
907 Fifth Avenue Co., Inc. _____ July, 1915.
M. S. C. Holding Corporation _____ August, 1915.
C. C. Corporation _____ May, 1916.
550 Park Avenue Corporation _____ May, 1916.
K. T. B. Realty Corporation _____ May, 1917.
115 Incorporated _____ April, 1919.

With the exception of the K. T. B. Realty Corporation and 630 Park Avenue Co., Inc., the corporations were organized for the purpose of building and operating in New York City apartment houses designed by J. E. R. Carpenter, architect and builder. The K. T. B. Realty Corporation operated flats or small residences and was a subsidiary of the C. C. Corporation which held all of its stock except a few qualifying shares. The 630 Park Avenue Co. had no active business during the years in question, but held a mortgage on cer-

tain land it had owned and on which an apartment was built and operated by the C. C. Corporation, which had given the mortgage.

J. E. R. Carpenter designed a distinctive type of apartment and he decided to build and operate apartment houses of this design and to incorporate each enterprise separately so that the failure of any one would not affect the success of the others. His plans were carried out, and the eight corporations are the result.

The percentages of stockholdings in the various corporations during the years in question were as follows:

| | M. S. C. Corporation | 960 Corporation | | 907 Corporation | C. C. Corporation | | 550 Corporation | 630 Corporation | K. T. B. Corporation | | 115 Corporation |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1918–1920 | 1918–1919 | 1920 | 1918–1920 | 1918 | 1919–1920 | 1918–1920 | 1918–1920 | 1918–1919 | 1920 | 1919–1920 |
| | Per ct. | Per ct. | Per ct. | Per ct. | Per ct. | Per ct. | Per ct. | Per ct. | Per ct. | Per ct. | Per ct. |
| J. E. R. Carpenter | .05 | | .10 | .04 | 23.45 | 23.45 | 29.10 | 1.00 | 1.67 | 1.67 | .05 |
| Mrs. M. S. Carpenter | 24.90 | 53.75 | 53.75 | | | | | 51.85 | | | 20.00 |
| E. M. Stires | 25.00 | 46.15 | 46.15 | | 25.00 | 25.00 | | 46.15 | | | 51.95 |
| J. H. Carpenter | 25.00 | | | | 25.00 | 25.00 | 35.45 | | | | |
| Francis R. Mayer | 25.00 | | | | | | 35.45 | | | | |
| B. Capps | .05 | | | | .05 | .05 | | | | 1.66 | |
| R. B. Knowles | | .10 | | 5.00 | | | | 1.00 | 1.67 | 1.67 | |
| Mabel H. Knowles | | | | .50 | | | | | | | |
| M. S. C. Holding Corp | | | | 79.86 | 25.00 | 25.00 | | | | | |
| C. C. Corporation | | | | | | | | | 95.00 | 95.00 | |
| Geo. W. Yepson | | | | | | | | | 1.66 | | |
| Vanderbilt & Burden | | | | 5.00 | | | | | | | |
| G. H. Storm & Co | | | | .10 | | | | | | | |
| Jos. G. Siegel | | | | | 1.50 | | | | | | |
| Geo. A. Kennedy | | | | 9.50 | | | | | | | |
| A. Creekmore | | | | | | 1.50 | | | | | |
| L. W. Stotesbury | | | | | | | | | | | 4.00 |
| M. C. Bouvier | | | | | | | | | | | 2.67 |
| A. P. Villa | | | | | | | | | | | 5.33 |
| B. Ewing | | | | | | | | | | | 16.00 |
| | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |

Each enterprise was conceived, planned, financed, controlled and directed by J. E. R. Carpenter. He invited certain relatives, friends and employees to participate in the various enterprises with the understanding that he was to control and manage them. None of the stock of any of the corporations has ever been offered for sale on the open market. The group of persons whom J. E. R. Carpenter permitted by invitation to participate in his real estate operations, consisted of Mrs. M. S. Carpenter, his wife; Ernest M. Stires, his brother-in-law; John H. Carpenter, his brother; and Francis R. Mayer, his brother's business partner and his personal friend (none of these persons were engaged in nor had any detailed knowledge of the real estate business); Bertrand Capps, an employee in the office of J. E. R. Carpenter, who was in charge of all the books of the various corporations and was also secretary or treasurer, or sometimes both, of five or six of the group of corporations; R. B. Knowles,

J. E. R. Carpenter's attorney and also general counsel for the group of corporations; Mabel H. Knowles, wife of R. B. Knowles; George W. Yepson, a close personal friend of J. E. R. Carpenter and also at that time secretary of the Grinnell Plumbing Co., which installed plumbing in several of the group of buildings; Vanderbilt & Burden, who had an interest in the land on which the building at 907 Fifth Avenue, New York City, was erected and who acquired the stock as a consideration when the land was acquired by the corporation; G. H. Storm & Co., lumber dealers who supplied lumber for most of the buildings and especially for 907 Fifth Avenue—George H. Storm of that company was a friend of J. E. R. Carpenter; Joseph G. Siegel, a friend of J. E. R. Carpenter; George A. Kennedy, nominee of a Chicago bank which held the stock of Wells Brothers as a pledge—Wells Brothers were the contractors for the building at 907 Fifth Avenue and the stock held by them was purchased by J. E. R. Carpenter in 1921; A. Creekmore, an employee in the office of J. E. R. Carpenter and superintendent of all the group of buildings and in charge of the purchase of supplies, of repairs and alterations, and of renting the apartments; L. W. Stotesbury, a friend of J. E. R. Carpenter and the attorney who prepared the articles of incorporation of 115 Incorporated; M. C. Bouvier, brother-in-law of B. Ewing; A. P. Villa, close personal friend of B. Ewing; and B. Ewing, a builder and operating real estate man who was at one time a partner of J. E. R. Carpenter for the purpose of renting apartments.

In each instance when J. E. R. Carpenter planned to build and operate an apartment house he outlined his plans to his relatives and friends and invited them to invest. Any of them having the ready money would turn it over to J. E. R. Carpenter with the understanding that he was to invest it in the building enterprise which he was to control and manage. None of the individuals invested with the purpose of buying certain shares of stock in a certain corporation, but instead, turned the money over to J. E. R. Carpenter with full confidence that he would use the money to their best interests. The stock held by Mrs. Carpenter was given to her by J. E. R. Carpenter. Practically all of the stock of the various corporations was held by J. E. R. Carpenter, his relatives by blood or marriage, and his and his brother's close personal friend, Francis R. Mayer.

The officers and directors of the various corporations were J. E. R. Carpenter's relatives, close personal friends, or his employees. J. E. R. Carpenter was an officer and director in each of the corporations and actually controlled and directed all activities of each corporation. None of the other stockholders, officers or directors took any part in the management of any of the corporations. No stockholders'

or directors' meetings were actually held during the years in question, and none was ever requested. J. E. R. Carpenter took such action as he deemed necessary and then directed his employee, B. Capps, or his attorney, R. B. Knowles, to draw up minutes of a stockholders' or directors' meeting expressing such action already taken and such minutes were sent to the various individuals, whose signatures were required by the by-laws, for their signatures. This method was provided for by the by-laws of the various corporations and was done as a matter of form for corporate records. These minutes were always signed by the individuals as a matter of course and without question as to the propriety of the action taken by J. E. R. Carpenter.

All of the business of the various corporations was carried on in one office, that of J. E. R. Carpenter, and was performed by him and his employees. All of the buildings owned by the various corporations were managed by J. E. R. Carpenter as a single enterprise. He rented the apartments, collected the rents, paid all bills, took care of all repairs and alterations, and purchased in bulk the supplies for all the buildings. J. E. R. Carpenter employed and paid a general manager, A. Creekmore, for all of the buildings and the superintendent of each building reported to him. J. E. R. Carpenter also employed R. B. Knowles as general counsel for all the corporations and B. Capps, who was in charge of all the books of all the corporations. Capps' salary was paid partly by Carpenter and partly by the various corporations. Each corporation had its separate books of account in which its rents were credited and its expenses debited. A central account known as the J. E. R. Carpenter Operating Account, upon which B. Capps and J. E. R. Carpenter were authorized to draw checks, was maintained for the purpose of paying all bills, pay rolls and operating expenses of all the corporations. Employees in any of the buildings were paid in cash by A. Creekmore, who was given a check on this central operating account.

Checks were drawn against the accounts of the various corporations for expenses incurred and deposited to this central operating account from which all expenses were actually paid. In some instances the by-laws of the corporations required two signatures on their checks and where this was the case, J. E. R. Carpenter was always one of the officers of the corporation to sign and it was the custom to have the other officer sign twenty-five or fifty blank checks and turn them over to J. E. R. Carpenter for use as needed. In the instances where the by-laws of the corporations required only one signature, J. E. R. Carpenter was always the officer required to sign the checks. Where coal and other supplies were purchased in bulk by J. E. R. Carpenter, the various corporations were charged for the

proportionate amounts actually received. All bills were sent to the office of J. E. R. Carpenter. A second account, known as the J. E. R. Carpenter Special No. 4, was also maintained, from which large payments for the corporations, such as interest, were made by check signed by B. Capps at times when J. E. R. Carpenter was out of the city and checks could not be drawn on the separate accounts of the corporations.

From time to time the corporations made loans to each other. The funds of one corporation were used by J. E. R. Carpenter for the purposes of another, and if these loans were only for a short period, no interest was charged. However, if the funds were used in aiding the construction of a new building or for some other purpose, and the loan was for a period of more than three or four months, then interest was charged. At times, the several corporations were overdrawn in their respective amounts in the J. E. R. Carpenter Special No. 4 Account, but no interest was charged on such overdrafts. During the years in question, J. E. R. Carpenter personally guaranteed a building loan obtained by one of the corporations from a source outside of this group of corporations.

The stockholders of the various corporations had absolute confidence in the ability of J. E. R. Carpenter and, in fact, considered that they had invested in his business; they never questioned his actions nor called for a meeting or an inspection of the books during the years in question. J. E. R. Carpenter had complete actual control of the management of all the buildings owned by the various corporations, and received a commission of 3 per centum of the amount of the rents received. During the years in question, J. E. R. Carpenter was also engaged as an architect and builder for operations having no connection with this group of corporations, and in the furtherance of these outside interests he used the same office and employees.

For the years 1918, 1919, and 1920, these eight corporations filed consolidated income and excess-profits-tax returns, claiming to be affiliated with each other within the meaning of section 240(b) of the Revenue Act of 1918. The Commissioner upon audit of the returns ruled that 960 Park Avenue Co., Inc., and 630 Park Avenue Co., Inc., were affiliated with each other and that C. C. Corporation and K. T. B. Realty Corporation were affiliated with each other, but that none of the other corporations were affiliated with either of the two groups nor with each other. It is from this determination that the petitioners have appealed.

OPINION.

TRUSSELL: With reference to the K. T. B. Realty Corporation and the 630 Park Avenue Co., Inc., the Board is without jurisdiction to

determine their tax liability for any of the years here in question for the Commissioner has asserted no additional tax against them. However, for the purposes of this appeal, and for the sole purpose of determining whether a certain group of corporations were affiliated during the years 1918, 1919, and 1920, and further, the two corporations and the parties to this proceeding having consented thereto, the Board will join the two above-named corporations in this proceeding for the purpose of making a clear record of the transactions and facts involved.

The question before us is whether the eight corporations, whose names are set out in the findings of fact, were during the years 1918, 1919, and 1920, affiliated within the meaning of section 240(b) of the Revenue Act of 1918, which provides:

> For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests.

It is apparent from the findings of fact that J. E. R. Carpenter, his relatives and Francis R. Mayer constituted the *same interests*. Each of the five individuals, J. E. R. Carpenter; Mrs. M. S. Carpenter, his wife; E. M. Stires, his brother-in-law; J. H. Carpenter, his brother; and Francis R. Mayer, his brother's business partner and his own personal friend, did not hold the same amount of stock or even any stock in all of the eight corporations, but we are convinced that under the facts in this case that was not necessary.

All of these five persons joined in the several corporate enterprises here under consideration as joint adventurers and promoters of each and all of the corporate entities created by them. They are jointly and separately the *same interests*. The Board said in the *Appeal of Rishell Phonograph Co.*, 2 B. T. A. 229:

> When Congress said "controlled by the same *interests*," we believe it meant something broader than *persons* or *individuals*. If "the same interests" was intended to mean only "the same persons," it would have been easy for Congress, by using the latter term, to have avoided all ambiguity. When two persons are guided in their action by a common interest (in the objective sense), they frequently constitute a single interest (in the subjective sense).

The Board said in the *Appeal of Germantown Braid Co.*, 3 B. T. A. 1336:

> The "same interests" does not necessarily mean the same individuals. The relationship between the individuals and the facts and circumstances of the case should be considered in determining whether different individuals are in fact the "same interests." Family groups owning stock in different corporations, under the circumstances of this case, may fairly be said to be the same interests.

In that case the percentages of stockholdings of the individuals varied in the two corporations involved.  See also *Appeal of Wright Cake Co.*, 2 B. T. A. 58.

Upon all of the facts contained in the record of these two actions, we are convinced that the M. S. C. Holding Corporation, 960 Park Avenue Co., Inc., 907 Fifth Avenue Co., Inc., C. C. Corporation, 550 Park Avenue Corporation, K. T. B. Realty Corporation, and 630 Park Ave. Co., Inc., are corporations substantially all of whose stock is owned and controlled by the same interests and, therefore, are entitled, under the provisions of section 240 of the Revenue Act of 1918, to make consolidated returns for purposes of income and profits tax and to have their tax liability determined upon the basis of such consolidated returns for each of the years 1918, 1919, and 1920.

Respecting the corporation known as 115 Incorporated, the situation is somewhat different.  There here appears to be a substantial minority interest sufficient to distinguish it from the other corporations here under consideration, and we are of the opinion that the income and profits tax liability of 115 Incorporated for the year 1920 must be determined upon the basis of its invested capital and income and that it is not affiliated with any other corporation.

> *The deficiencies may be redetermined in accordance with the foregoing findings of fact and opinion upon 15 days' notice, pursuant to Rule 50, and judgment will be entered accordingly.*

PHILLIPS and MURDOCK dissent.